# EXHIBIT B

**PAUL, REICH & MYERS, P.C.**
ATTORNEYS AT LAW
1608 WALNUT STREET, SUITE 500
PHILADELPHIA, PENNSYLVANIA 19103
Tel. (215) 735-9200  Fax (215) 735-3888

FILED
APR 11 2008
Civil Administration

ROBERT E. PAUL
ALAN I. REICH
RICHARD P. MYERS
ELIOT PRESENT

April 9, 2008

HONORABLE ALLAN TERESHKO
Court of Common Pleas
Complex Litigation Center
Room 622, City Hall
Philadelphia, PA 19107

RE:   Corson v. Westinghouse Airbrake (American Standard) PCCP 0706-1384
      Control No.: 030869
      Opposing Counsel: Daniel Ryan
      May 2008 Group 2180 (Mesothelioma)
      Asbestos Case

Dear Judge Tereshko:

Westinghouse Airbrake (Wabco) and Johns-Manville (JM) each owned 50% of Railroad Friction (RFPC). RFPC was created to distribute the Cobra shoes. The Cobra brake shoes was a joint venture of JM and Wabco (Exhibit C) which both helped build the product (Exhibit A). At all times material (i.e. prior to 1980 when asbestos was removed from the shoe) RFPC consisted of one full time employee and 3 halftime employees. The remainder of the work of the three half timers was spent as Wabco employees. The RFPC operation was housed in a small portion of Wabco's building (Exhibit B). As the co-manufacturer of Cobra shoes Wabco is liable for injuries caused by Cobra shoes (Exhibit F). Both Terry (Exhibit D) and George Corson the younger (Exhibit E) describes their father's exposure to gaskets on Westinghouse air brake valves and compressors. The Westinghouse air brake valves and compressors contained asbestos gaskets. (Exhibit G). As to Cobra shoe liability for Corson's injury see answer to RFPC's motion incorporated by reference pursuant to PA R.C.P. 1019 I note that in cancer causation one exposure is enough as even defense experts such as DeLisser will concede (Exhibit H) and the evidence is one cell turning cancerous starts the process which is the basis for the every breath testimony as noone knows which fiber caused which cell to become cancerous (Exhibit I).

Very truly yours,

PAUL, REICH & MYERS, P.C.

BY: _____
ROBERT E. PAUL

REP/am

cc:   Daniel Ryan

IN THE COURT OF COMMON PLEAS
OF PHILADELPHIA COUNTY
CIVIL SECTION: TRIAL DIVISION

| | |
|---|---|
| GLORIA GAIL KURNS, Executrix of the Estate of GEORGE M. CORSON, deceased, and FREIDA E. JUNG CORSON, | : JUN TERM, 2007 : : |
| vs | : NO 0706-1384 : |
| A.W. CHESTERTON, INC. | : ASBESTOS CASE |

## ORDER

**AND NOW,** to wit, this _____ Day of _____, 2008, the motion for summary judgment of **Westinghouse Airbrake (American Standard)** is hereby DENIED.

BY THE COURT:

_____ J.

# EXHIBIT A

OF ALABAMA
MAR. 18 1966
INESS LIBRARY



# 1965 ANNUAL REPORT
## WESTINGHOUSE AIR BRAKE COMPANY

Labor agreements for all operations are negotiated to 1967. Late in 1965 WABCO negotiated long-term agreements involving approximately one-third of total hourly employees.

## Railroad and Mass Transit

The market for air brakes and related products was excellent. WABCO operated its facilities at capacity. New facilities were completed, but early start-up difficulties delayed production at designed capacities.



*Railroad Braking Systems*

Highlights of 1965 sales activity follow.

• 35% of sales in 1965 involved products introduced to the market within the past 5 years.

• 42% of the new freight cars built in 1965 were equipped with the WABCOPAC brake assembly—23% were so equipped in 1964.

• 49% of the new freight cars built in 1965 were equipped with COBRA* brake shoes (a product manufactured by Railroad Friction Products, which is owned jointly with Johns-Manville Corporation). Sales of COBRA brake shoes, including replacements, increased 42.3% in 1965.

• 45% of the new freight cars built in 1965 were equipped with the Company's ABD valve, a greatly improved version of WABCO's AB product.

The ABD valve has been sold to all of the major car builders and 71% of the railroads own at least some cars equipped with the new product.

Several important new products for the railroad industry were introduced in 1965 designed to improve control, increase the load that can be carried, reduce weight, or exchange mechanical for manual operation. They are: Freight Brake Repeater Unit, Remote Multiple Unit Brake Control System, Unitized Locomotive Brake Equipment, and Automatic Car Coupler (mass transit cars).

Sales of traffic control, signal, and classification equipment increased in 1965. The number of major jobs did not increase appreciably over the low levels experienced in recent years, but there was substantially more activity in the market confirming earlier anticipation that revitalization of this area of the Company's business is about to occur.

### Mass Transit

Mass transit is a major market opportunity for WABCO to increase sales in the near future. While precise details of this opportunity cannot now be defined, identified prospects include:

*Registered Trademark of Railroad Friction Products Corporation.

7

RFPC - 152

# EXHIBIT B



# The Modern Brake Shoe for Modern Railroading

## Friction Material Technology—

The basic research that led to the development of the COBRA composition brake shoe innovation continues to this day. The Manville Corporation, with over 50 years of friction material experience, provides the research support for COBRA Shoes through its technical center in Denver, Colorado.

## Railroad Braking Technology—

Merging the science of friction materials to the science of railroad braking in the creation of COBRA Shoes was the role of the Westinghouse Air Brake Division of American Standard Inc. This originator of the air brake, and still a leader in today's braking technology, also contributes to the success of COBRA Shoes through their extensive facilities in Wilmerding, Pennsylvania.

## Developmental Testing—

Three full-scale, computer-controlled or computer analyzed dynamometers are used to study COBRA Shoe performance under a wide range of operating conditions and environments. Car and locomotive weights from 26,000 to 400,000 pounds and speeds up to 250 mph can be simulated to provide information for continuous product upgrading.



# EXHIBIT C

```
 1    SUPREME COURT:
 2    STATE OF NEW YORK COUNTY OF NASSAU
 3    IN RE:  ASBESTOS LITIGATION
 4
 5
 6
 7              DEPOSITION UNDER ORAL
 8                 EXAMINATION OF
 9                 DAVID T. KERR
10
11    This Document Applies to:
12    JOSEPH FABIAN and MARGARET GRASEK,
13    individually and MARGARET GRASEK,
14    individually and as Executrix of the
15    Estate of LOUIS GRASEK and JOHN
16    HAUGH, individually and as Executor
17    of the Estate of JOHN HAUGH,
18    Plaintiffs
19    INDEX NO. 01-12777
20
21
22         PRIORITY-ONE COURT REPORTING
23              SERVICES, INC.
24              899 Manor Road
25       Staten Island, New York  10314
```

Page 162

at you worked at WABCO that would
related to asbestos and air brake
uipment would be, if anything,
ould be these minutes that we are
lking about? There's nothing
se.
    ATTORNEY CAMP:
      Object to the form of
   the question.
Y ATTORNEY PAUL:
    There's nothing else that
u have at your house?
    No. I was going to say,
ey weren't taken out of the
fice. They came to my house.
    I got you.
    My mailing address was
me for that association.
    Got you. I understand
at. You were a member as an
dividual. Okay. So there you
ve no other documents other than
ose that relate to --- that would
late to asbestos and air brake
uipment at your house or any other

Page 163

ssession of yours?
    No, sir.
    ATTORNEY PAUL:
      I'm going turn over
   the floor for Mr. Lloyd
   for a few things and then
   I will take it back.
Y ATTORNEY LLOYD:
    Hi, Mr. Kerr. Good
ternoon. A few questions. When
u were employed by WABCO, were you
ware of what the relationship, if
y, there was between WABCO and
ailroad Friction Products.
    ATTORNEY CAMP:
      Object to the form of
   the question.
    I had knowledge of --- was
formed as to the relationship,
es.
Y ATTORNEY LLOYD:
    And what was your
nowledge or what you informed the
lationship between the two
ntities was?

Page 164

1      ATTORNEY HORRIGAN:
2        Objection, can we
3    have a time frame at what
4    point.
5 BY ATTORNEY LLOYD:
6 Q.    I just want to know at any
7 point what was your knowledge with
8 respect to the relationship between
9 WABCO and Railroad Friction?
10 A.    WABCO is a part owner of
11 Railroad Friction products.
12 Q.    Okay. Now, at some point
13 did that relationship, being a part
14 owner, did that change any way?
15 Were they always a part owner?
16 A.    When American Standard
17 bought Westinghouse Air Brake, it
18 became American Standard as a part
19 owner.
20 Q.    And then was there another
21 change when American Standard, I
22 think you said spun off WABCO. Was
23 there another change in the
24 relationship between WABCO and
25 Railroad Friction when that

Page 165

1 occurred?
2 A.    Yes.
3      ATTORNEY CAMP:
4        Now you're talking
5    about a period --- are you
6    still talking about a
7    period which he was
8    employed at WABCO? That
9    was what your question was
10   predicated on initially?
11     ATTORNEY LLOYD:
12       Right. But I'm just
13   asking him what he knows.
14     ATTORNEY CAMP:
15       During the time he
16   was employed at WABCO?
17     ATTORNEY LLOYD:
18       No.
19     ATTORNEY CAMP:
20       All right. I want to
21   clear it up. I'm not
22   being contentious.
23     ATTORNEY LLOYD:
24       I know.
25 BY ATTORNEY LLOYD:

Page 206

```
 1    question.
 2    BY ATTORNEY LLOYD:
 3    Q.      What was Mr. Graham's
 4    title or possession, if you know,
 5    for Railroad Friction?
 6    A.      I'm really sure ever his
 7    title exact title.
 8    Q.      Do you know what he did?
 9    A.      Well, he oversaw the
10    Railroad Friction products
11    operations, as far as I know.
12    Q.      And who was working in
13    customer service for Railroad
14    Friction products.
15            ATTORNEY CAMP:
16            He just testified
17            there was one employee.
18            All right?  I'm sorry.  Go
19            ahead.
20            ATTORNEY LLOYD:
21            I know.
22    BY ATTORNEY LLOYD:
23    Q.      Let me preface the
24    question by saying that you told me
25    that the Railroad Friction
```

Page 207

```
 1    operations were customer service was
 2    in the general offices building.  My
 3    question is, do you know any do you
 4    know the number of people that were
 5    situated in the customer service
 6    area of Railroad Friction products
 7    in that particular building?
 8            ATTORNEY HORRIGAN:
 9            Object to form.
10            ATTORNEY LLOYD:
11            Can you follow that?
12            ATTORNEY CAMP:
13            He can answer it.
14    A.      I think there were three
15    people as I recall.
16    BY ATTORNEY LLOYD:
17    Q.      Now, the three people that
18    were doing customer service do you
19    know by whom they were employed?
20    A.      They got their paycheck
21    from Westinghouse Air Brake.
22    Q.      And by the way, in 1978,
23    were you getting your checks from
24    Westinghouse Air Brake Company as
25    well?
```

Page 208

```
 1    A.      I'm sorry.  I said let me
 2    --- '78, that would be American
 3    Standard.  Wait.  No, that changed.
 4    No, it changed in '78 sometime so
 5    I'm not sure.
 6    Q.      Okay.
 7    A.      It was between maybe the
 8    two companies.
 9    Q.      At the time that you were
10    doing the you the time you made this
11    committee disclosure in 1978 about
12    the asbestos products that were
13    being purchased by WABCO, it was the
14    transition time, you're telling me,
15    between WABCO and American
16    Standard?
17            ATTORNEY CAMP:
18            Object to form.
19    A.      As far as absorbing the
20    company, you know, Westinghouse Air
21    Brake Company into American
22    Standard, yes, where they lost their
23    name somewhere in there.
24    BY ATTORNEY LLOYD:
25    Q.      I want go back and revisit
```

Page 209

```
 1    it.  You told me that the three
 2    people working for customer service
 3    for RFP, you thought you were
 4    getting WABCO paychecks.  Are you
 5    sure that happened or are you sure
 6    they were getting WABCO paychecks or
 7    was it ASI paychecks?
 8    A.      Well, the transition was
 9    that year.  So I really don't know.
10    Their paycheck would change the same
11    time mine changed from Westinghouse
12    to American Standard.
13    Q.      Would it be fair to say
14    then that it was either your
15    Westinghouse Air Brake check or
16    American Standard check?
17    A.      Yes.
18    Q.      Aside from the general
19    offices building on the hill and the
20    engineering building, I mean, how
21    far away were these?  Were they
22    walkable or were they ---?
23    A.      Yeah, I'd run up the down
24    the hill quite frequently, half a
25    mile from it.
```

Page 202

1    certain products purchased by cab
2    WABCO that had asbestos in them,
3    that's the time frame I'm talking
4    about now.
5            ATTORNEY CAMP:
6                I'm going to object
7                to the form of your
8                statement. And you can
9                answer it?
10   A.    Well, there's a multitude
11   of functions in the general office.
12   The executives were there. The
13   finance department was there, the
14   Railroad Friction Products
15   operations was there.
16   BY ATTORNEY LLOYD:
17   Q.    All right. When I say
18   executives, would that be executives
19   for WABCO were up there? Is that
20   what you're talking about when you
21   say executives?
22   A.    Yes.
23   Q.    Also executives for
24   Railroad Friction Products were in
25   that building as well?

Page 203

1    A.    No. I'm talking
2    Westinghouse Air Brake.
3    Q.    When you say the finance
4    department, was that Westinghouse
5    Air Brake finance department?
6    A.    Yes, sir.
7    Q.    Now, you told me Railroad
8    Friction Product operations was in
9    that building?
10   A.    Their customer service was
11   there.
12   Q.    What else involving
13   Railroad Friction was in that same
14   building the general offices
15   building?
16   A.    Just the customer service
17   function.
18   Q.    Okay. Was there a
19   separate building where the ---
20   strike that. I'm sorry.
21          Did Railroad Friction
22   Products, as far you know, have any
23   have separate executives from
24   Westinghouse Air Brake Company?
25   A.    I don't know the officers

Page 204

1    in the Railroad Friction Products.
2    Q.    Did you know anybody in
3    --- strike that.
4            Did Railroad Friction
5    Products have a separate finance
6    department from Westinghouse Air
7    Brake Company?
8            ATTORNEY HORRIGAN:
9                Can we be specific as
10               to time?
11           ATTORNEY LLOYD:
12               All my questions now
13               are in this 1978 time
14               frame that we've been
15               talking about when he was
16               on this committee?
17   A.    They had a person assigned
18   to handle the financial aspects of
19   RFPC.
20   BY ATTORNEY LLOYD:
21   Q.    All right. And where was
22   that person located, if you know?
23   That person's office, his or her
24   office?
25   A.    That would be in the

Page 205

1    general office building.
2    Q.    Do you know how many
3    employees RFPC had in 1978, other
4    than this person who was doing ---
5    strike that. I don't know ---
6    strike that.
7            ATTORNEY VITSAS:
8                I was getting ready
9                ---.
10   BY ATTORNEY LLOYD:
11   Q.    Do you know how many
12   employee RFPC had in 1978?
13   A.    One.
14   Q.    Who was that?
15   A.    A fellow by the name of
16   Bill Graham.
17   Q.    Was Mr. Graham the account
18   guy that you told me was doing the
19   accounts.
20           ATTORNEY CAMP:
21               Object to form.
22           ATTORNEY VITSAS:
23               Object to form.
24           ATTORNEY LLOYD:
25               I'll rephrase the

EXHIBIT D

Page 190

    THE WITNESS: Scrapers that I had the blacksmith make to my order.
BY MS. DYSON:
Q  And who long would it take to scrape an old gasket off?
    MR. MYERS: How long would it take to scrape an old gasket off?
    THE WITNESS: On a trailer head on an air compressor, probably two hours.
BY MS. DYSON:
Q  And could you describe the shop area where you did this work at Othello?
    MR. MYERS: Can you describe the shop area at Othello where you did this work?
    THE WITNESS: It was a roundhouse that was built for steam engines and converted over to work the diesels then.
BY MS. DYSON:
Q  Do you know approximately the size of the roundhouse?
    MR. MYERS: I'm sorry; say that again, please.
BY MS. DYSON:
Q  What was approximately the size?
    MR. MYERS: What was the

Page 191

approximate size of the roundhouse?
    THE WITNESS: Well, they could put twelve diesels in it.
    MR. MYERS: You could put twelve diesels in it.
BY MS. DYSON:
Q  Did it have different sections?
    MR. MYERS: Did it have different sections?
    THE WITNESS: No.
BY MS. DYSON:
Q  Was there other equipment inside of this roundhouse?
    MR. MYERS: Was there other equipment inside the roundhouse?
    THE WITNESS: What equipment it had, yes.
BY MS. DYSON:
Q  What other types of equipment was inside the roundhouse?
    MR. MYERS: What other equipment was inside the roundhouse?
    THE WITNESS: Oh, they didn't have any kind of test equipment in there. They stored oil in there, grease and that

Page 192

sort of stuff.
BY MS. DYSON:
Q  Did you have to perform any work on the other equipment in the roundhouse?
    MR. MYERS: Did you have to perform any work on the other equipment in the roundhouse?
    THE WITNESS: No.
BY MS. DYSON:
Q  Was the roundhouse dirty from the exhaust from the diesels?
    MR. MYERS: Was the roundhouse dirty from the exhaust from the diesels?
    THE WITNESS: It wasn't really too bad because it was warm enough out there you could leave the doors open. It wasn't near as bad as Harlowtown, where you had to keep the doors shut in thirty degrees below winter.
BY MS. DYSON:
Q  And how many doors did the roundhouse have?
    MR. MYERS: How many doors did the roundhouse have?
    THE WITNESS: How many doors?

Page 193

    MR. MYERS: Yes.
    THE WITNESS: Two doors for each stall.
    MR. MYERS: And how many stalls?
    MS. DYSON: Thanks.
    THE WITNESS: There was twelve stalls.
    MR. MYERS: Okay. So twenty-four doors; right?
    THE WITNESS: (Witness nods head).
    MR. MYERS: Okay.
BY MS. DYSON:
Q  You said earlier that the replacement gasket you used had a GM on the tag.
    MR. MYERS: You said earlier that the replacement gasket you used had a GM on the tag.
    THE WITNESS: Yeah.
BY MS. DYSON:
Q  Do you recall what context the GM was written in?
    MR. MYERS: Do you remember what context the GM was written in?
    THE WITNESS: No.

Page 194

BY MS. DYSON:
Q Do you remember anything else on that tag?
MR. MYERS: Do you remember anything else on that tag?
THE WITNESS: No.
BY MS. DYSON:
Q Where were the replacement gaskets obtained?
MR. MYERS: Were the replacement gaskets obtained?
THE WITNESS: Where were they from?
MR. MYERS: Yes.
THE WITNESS: We got them from the store department. Where they come from, I have no idea.
BY MS. DYSON:
Q Did you physically go to the store department yourself to retrieve them?
MR. MYERS: Did you go to the store department yourself to retrieve them?
THE WITNESS: Yeah.
BY MS. DYSON:
Q How were they stored?

Page 195

MR. MYERS: How were they stored?
THE WITNESS: It was hung up on a tape.
BY MS. DYSON:
Q Were they in their packaging?
MR. MYERS: Were they in their packaging?
THE WITNESS: They was in a cellophane package, each one separate.
BY MS. DYSON:
Q Do you remember any writing on the package?
MR. MYERS: Do you remember any writing on the package?
THE WITNESS: No, I don't.
BY MS. DYSON:
Q Were they pre-cut or did you have to make them yourself?
MR. MYERS: Were they pre-cut or did you have to make them yourself?
THE WITNESS: They was all pre-cut. You just put them on.
BY MS. DYSON:
Q How long did it take to put them on?
MR. MYERS: How long did it take

Page 196

to put them on?
THE WITNESS: Oh, not over two hours.
BY MS. DYSON:
Q Now, earlier you said there would be dust. What part of the installation process would there be dust?
MR. MYERS: Earlier you said that there would be dust. What part of the installation process would there be dust?
THE WITNESS: On scraping the gaskets off of the air compressor itself.
BY MS. DYSON:
Q Okay. Any dust when you installed the pre-cut gaskets?
MR. MYERS: Any dust when you installed the pre-cut gasket?
THE WITNESS: Yeah, because -- not installing it. It was the dust taking the old one off.
MR. MYERS: Okay. But the question is, when you installed the new one --
THE WITNESS: No.
MR. MYERS: There's no dust from

Page 197

the new one?
THE WITNESS: No.
MR. MYERS: Okay.
BY MS. DYSON:
Q Besides what we've just discussed, have you used any asbestos-containing product in connection with your work on GM diesels at the railroad at any other time?
MR. MYERS: Besides what we've just discussed, have you used any other asbestos products on the GM diesels besides -- at any other time?
THE WITNESS: No.
MR. MYERS: No.
THE WITNESS: Well, now let's go back. I renewed two gaskets on the stack.
MR. MYERS: Two stack gaskets?
THE WITNESS: Yeah.
MS. DYSON: What was that; I'm sorry?
MR. MYERS: He removed two stack gaskets where the exhaust comes out of the diesel engines.
BY MS. DYSON:
Q Okay. And what location was this done?

Page 190

THE WITNESS: Scrapers that I had the blacksmith make to my order.
BY MS. DYSON:
Q   And who long would it take to scrape an old gasket off?
MR. MYERS: How long would it take to scrape an old gasket off?
THE WITNESS: On a trailer head on an air compressor, probably two hours.
BY MS. DYSON:
Q   And could you describe the shop area where you did this work at Othello?
MR. MYERS: Can you describe the shop area at Othello where you did this work?
THE WITNESS: It was a roundhouse that was built for steam engines and converted over to work the diesels then.
BY MS. DYSON:
Q   Do you know approximately the size of the roundhouse?
MR. MYERS: I'm sorry; say that again, please.
BY MS. DYSON:
Q   What was approximately the size?
MR. MYERS: What was the

Page 191

approximate size of the roundhouse?
THE WITNESS: Well, they could put twelve diesels in it.
MR. MYERS: You could put twelve diesels in it.
BY MS. DYSON:
Q   Did it have different sections?
MR. MYERS: Did it have different sections?
THE WITNESS: No.
BY MS. DYSON:
Q   Was there other equipment inside of this roundhouse?
MR. MYERS: Was there other equipment inside the roundhouse?
THE WITNESS: What equipment it had, yes.
BY MS. DYSON:
Q   What other types of equipment was inside the roundhouse?
MR. MYERS: What other equipment was inside the roundhouse?
THE WITNESS: Oh, they didn't have any kind of test equipment in there. They stored oil in there, grease and that

Page 192

sort of stuff.
BY MS. DYSON:
Q   Did you have to perform any work on the other equipment in the roundhouse?
MR. MYERS: Did you have to perform any work on the other equipment in the roundhouse?
THE WITNESS: No.
BY MS. DYSON:
Q   Was the roundhouse dirty from the exhaust from the diesels?
MR. MYERS: Was the roundhouse dirty from the exhaust from the diesels?
THE WITNESS: It wasn't really too bad because it was warm enough out there you could leave the doors open. It wasn't near as bad as Harlowtown, where you had to keep the doors shut in thirty degrees below winter.
BY MS. DYSON:
Q   And how many doors did the roundhouse have?
MR. MYERS: How many doors did the roundhouse have?
THE WITNESS: How many doors?

Page 193

MR. MYERS: Yes.
THE WITNESS: Two doors for each stall.
MR. MYERS: And how many stalls?
MS. DYSON: Thanks.
THE WITNESS: There was twelve stalls.
MR. MYERS: Okay. So twenty-four doors; right?
THE WITNESS: (Witness nods head).
MR. MYERS: Okay.
BY MS. DYSON:
Q   You said earlier that the replacement gasket you used had a GM on the tag.
MR. MYERS: You said earlier that the replacement gasket you used had a GM on the tag.
THE WITNESS: Yeah.
BY MS. DYSON:
Q   Do you recall what context the GM was written in?
MR. MYERS: Do you remember what context the GM was written in?
THE WITNESS: No.

Page 194

BY MS. DYSON:
Q  Do you remember anything else on that tag?
   MR. MYERS: Do you remember anything else on that tag?
   THE WITNESS: No.
BY MS. DYSON:
Q  Where were the replacement gaskets obtained?
   MR. MYERS: Were the replacement gaskets obtained?
   THE WITNESS: Where were they from?
   MR. MYERS: Yes.
   THE WITNESS: We got them from the store department. Where they come from, I have no idea.
BY MS. DYSON:
Q  Did you physically go to the store department yourself to retrieve them?
   MR. MYERS: Did you go to the store department yourself to retrieve them?
   THE WITNESS: Yeah.
BY MS. DYSON:
Q  How were they stored?

Page 195

   MR. MYERS: How were they stored?
   THE WITNESS: It was hung up on a tape.
BY MS. DYSON:
Q  Were they in their packaging?
   MR. MYERS: Were they in their packaging?
   THE WITNESS: They was in a cellophane package, each one separate.
BY MS. DYSON:
Q  Do you remember any writing on the package?
   MR. MYERS: Do you remember any writing on the package?
   THE WITNESS: No, I don't.
BY MS. DYSON:
Q  Were they pre-cut or did you have to make them yourself?
   MR. MYERS: Were they pre-cut or did you have to make them yourself?
   THE WITNESS: They was all pre-cut. You just put them on.
BY MS. DYSON:
Q  How long did it take to put them on?
   MR. MYERS: How long did it take

Page 196

to put them on?
   THE WITNESS: Oh, not over two hours.
BY MS. DYSON:
Q  Now, earlier you said there would be dust. What part of the installation process would there be dust?
   MR. MYERS: Earlier you said that there would be dust. What part of the installation process would there be dust?
   THE WITNESS: On scraping the gaskets off of the air compressor itself.
BY MS. DYSON:
Q  Okay. Any dust when you installed the pre-cut gaskets?
   MR. MYERS: Any dust when you installed the pre-cut gasket?
   THE WITNESS: Yeah, because -- not installing it. It was the dust taking the old one off.
   MR. MYERS: Okay. But the question is, when you installed the new one --
   THE WITNESS: No.
   MR. MYERS: There's no dust from

Page 197

the new one?
   THE WITNESS: No.
   MR. MYERS: Okay.
BY MS. DYSON:
Q  Besides what we've just discussed, have you used any asbestos-containing product in connection with your work on GM diesels at the railroad at any other time?
   MR. MYERS: Besides what we've just discussed, have you used any other asbestos products on the GM diesels besides -- at any other time?
   THE WITNESS: No.
   MR. MYERS: No.
   THE WITNESS: Well, now let's go back. I renewed two gaskets on the stack.
   MR. MYERS: Two stack gaskets?
   THE WITNESS: Yeah.
   MS. DYSON: What was that; I'm sorry?
   MR. MYERS: He removed two stack gaskets where the exhaust comes out of the diesel engines.
BY MS. DYSON:
Q  Okay. And what location was this done?